

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

KATLYN TAYLOR, Individually; as Administratrix
of the Estate of JERRY LEE TAYLOR II, Deceased;
and as Guardian of WESTON PIERCE TAYLOR and
JACKSON LEE TAYLOR, Minors                                              PLAINTIFF

versus                                          Civil Action No. 1:15cv286 HSO-JCG

OMEGA PROTEIN, INC.                                                    DEFENDANT

# COMPLAINT

### (Jury Trial Demanded)

COMES NOW Plaintiff Katlyn Taylor, Individually and in her capacities as Administratrix of the Estate of Jerry Lee Taylor II, Deceased, and as Guardian of Weston Pierce Taylor and Jackson Lee Taylor, Minors, and files this Complaint against the Defendant, Omega Protein, Inc. In support thereof Plaintiff would show unto the Court the following facts and matters, to wit:

### Parties

1.     Plaintiff, Katlyn Taylor ("Plaintiff" or "Mrs. Taylor"), is an adult resident citizen of Jackson County, Mississippi, residing at 17800 Fosters Road, Moss Point, Mississippi 39563. Mrs. Taylor is the widow of Jerry Lee Taylor II, Deceased and the mother of Weston Pierce Taylor and Jackson Lee Taylor, the natural children of Jerry Lee Taylor II. By Order of the Chancery Court of Jackson County, Mississippi, Mrs. Taylor has been duly appointed as the Administratrix of the Estate of Jerry Lee Taylor II, Deceased, and as the Guardian of her minor children, Weston Pierce Taylor and Jackson Lee Taylor.

2. Defendant Omega Protein, Inc. ("Omega") is a foreign corporation organized and existing under the laws of the state of Virginia which is admitted to do business in the state of Mississippi. Omega's registered agent for service of process is C.T. Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.

## Statutory Basis for Action

3. This action is brought under and pursuant to the provisions of *Miss. Code Ann. §11-7-13 (1972, as amended)* for the wrongful death of Jerry Lee Taylor II and for all persons entitled under the provisions of said section to recover for his wrongful death, being his widow, Katlyn Taylor (date of birth November 12, 1990), and his children, Weston Pierce Taylor (date of birth October 21, 2010) and Jackson Lee Taylor (date of birth February 13, 2015).

## Jurisdiction

4. This Court has original jurisdiction of this action pursuant to the provisions of 28 USCA § 1332 in that complete diversity of citizenship exists between all plaintiffs and all defendants and the amount in controversy exceeds the sum of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

5. This court has *in personam* jurisdiction over the Defendant by virtue of the facts that Defendant is admitted to do business in the state of Mississippi and committed a tort, in whole or part, within the state of Mississippi.

## Venue

6. This Court has venue of this action pursuant to the provisions of 28 USCA § 1391 in that a substantial part of the events, acts or omissions giving rise to the instant claim occurred or accrued within the Southern Division of the Southern District of Mississippi.

## Underlying Facts

### A.    The Flammable Gases in Stickwater Tank #10

7.    At all times pertinent hereto, Omega manufactured fish meal and fish oil, and for such purpose, owned and operated a fish processing plant in Moss Point, Mississippi. Omega's plant, which consists of a tank farm and other equipment, has the capacity to cook and process up to 1800 tons of fish per day. "Stickwater", a viscous liquid slurry of water, chemicals, and the organic remnants of cooked fish (fish solubles), is a byproduct of Omega's manufacturing process.

8.    Omega captured and stored stickwater in a steel tank known as Tank #10. Tank #10, one of several large tanks in the tank farm, was approximately 32 feet high by 40 feet in diameter with a liquid storage capacity of 300,789 gallons. Tank #10 was capped by a metal top weighing approximately 19,600 lbs.

9.    At all pertinent times hereto, Omega knew that the bacterial decomposition of organic matter, such as the fish solubles contained in stickwater, produced hazardous and flammable gases. The production of flammable gases such as hydrogen sulfide, methane and methanethiol (a mercaptan gas) by decomposition of the organic matter in stickwater is a known scientific fact in the fish processing industry.

10.    Hydrogen sulfide is a colorless and highly flammable gas which is heavier than air and collects in enclosed or poorly ventilated areas. Although it carriers the odor of "rotten eggs", hydrogen sulfide causes olfactory fatigue and quickly overcomes the human sense of smell, resulting in the false impression that the gas is no longer present.

11.    Hydrogen sulfide is produced in nature primarily through the decomposition (*i.e.*,

rotting) of proteins or organic material. A 1983 OSHA publication warned of the potential for exposure of "fishing and fish-processing workers" to hydrogen sulfide. "Toxic gases in the meat industry include ... hydrogen sulfide, which can build up in blood tanks, stickwater storage or holding tanks from rendering plants ..." *OHS Reference Guide to Australian Meat Industry.* "Fish quality may deteriorate under the anaerobic conditions found in onboard storage on fishing vessels and in the raw material silos of fish processing facilities. This deterioration causes the formation of odorous compounds such as .... mercaptans, and hydrogen sulfide gas." *2007 Environmental Health and Safety Guidelines for Fish Processing.* As recognized by a U.S. District Court in 1976:

> It is commonly known by chemists and biologists and by students taking these courses in college and by many laymen that deterioration of protein products and organic matter commonly produces hydrogen sulphide gas and that such gas in sufficient concentration is highly lethal. When fish scales and fish solubles in salt water are allowed to rot for several days in the hot sun in mid August, it should be a matter of common knowledge that such condition would probably produce hydrogen sulphide gas in dangerous concentrations if the water and solids are contained in an enclosed space.

*Consolidated Machines, Inc. v., Protein Products Corporation*, 428 F.Supp. 209, 218 (M.D. Fla. 1976).

12.     Methane is a colorless, odorless and flammable gas that occurs abundantly in nature as the result of anaerobic bacterial decomposition under water. Anaerobic bacteria acting on fish wastes, such as those found in stickwater, produce methane.

13.     Methanethiol (methyl mercaptan) is a colorless and extremely flammable gas which is heavier than air. Gas/air mixtures of methanethiol are explosive. Like hydrogen sulfide, methanethiol is produced by the anaerobic decomposition of organic raw material in the silos of fish processing facilities. *2007 Environmental Health and Safety Guidelines for Fish*

*Processing.*

### B. Omega's Failure to Warn of the Dangers of Tank #10

14. Hydrogen sulfide, methane, and methanethiol gases, produced by the decomposition of stickwater within Tank #10, are easily ignited by hot work activities such as cutting, welding or grinding. Despite that fact, Tank #10 was not marked with a clear and adequate warning. Rather, Tank #10 bore a standard industry safety placard which contained possible warnings, in a "multiple choice" type format, for Omega's selection.

15. In selecting the safety placard warnings for Tank #10, Omega mislabeled Tank #10 and failed to warn of the dangers of its contents. As marked by Omega, the safety placard placed on Tank #10 indicated that Tank #10's contents were "normally stable, even under fire exposure conditions", that the risk of flammability of its contents was low, and that exposure to its contents would not cause serious injury. Although the safety placard could have been marked to select other warnings for Tank #10 – such as "heat may detonate", "violent chemical change", and "unstable if heated" – Omega failed to mark the safety placard so as to select such warnings for Tank #10, and thereby failed to adequately warn of Tank #10's dangers, including the flammability of its contents.

### C. New Construction involving Tank #10

16. In early 2014 Omega planned construction of an additional stickwater holding tank to be designated as Tank #4. Tank #4's design specifications called for it to be the same approximate size and capacity as Tank #10 and to be built adjacent to Tank #10. Plans for the new tank also called for construction of a catwalk which would stretch across the top of Tank #10 and extend to the top of Tank #4. The estimated completion date for all work was June 1,

2014.

17.     Omega contracted with Accu-Fab & Construction, Inc. ("Accu-Fab") for fabrication and erection of Tank #4 and the catwalk from Tank #10 to Tank #4. In turn, Accu-Fab contracted with a staffing agency, Global Employment Service, Inc. ("Global"), for the skilled labor and manpower necessary for performance of its contract with Omega.

18.     The new construction at Omega did not proceeding in a timely fashion, causing delay in Omega's timetable for completion of Tank #4 and the catwalk. Omega's frustration with the delay caused it to deviate from the original order in which the construction was planned and advance the date for performance of certain construction tasks. in which certain construction tasks were planned. Such an instance occurred on the morning of July 28, 2014, when Omega abruptly accelerated the date for catwalk work on Tank #10 and instructed Accu-Fab to cut piping off of the top of Tank #10 to make way for installation of the catwalk. As of July 28, 2014, Accu-Fab had no knowledge of the flammable gases contained inside Tank #10.

### D.     Omega's Misrepresentation of the Dangers of Tank #10

19.     Pursuant to the procedures in place for the work at Omega, if Accu-Fab desired that a work area be "sniffed" for the presence of flammable gas then Accu-Fab made that request to Omega. Then, Omega personnel would conduct a test for flammable gas with a combustible gas detector and "clear" the area, authorizing authorize Accu-Fab to proceed with hot work. This procedure is evidenced by the fact that it was actually followed, at least with respect to Tank #4. On the morning of July 28, 2014, at Accu-Fab's request, Omega used a combustible gas detector to sniff the interior of Tank #4, clearing it's interior for work by Accu-Fab personnel.

20.     Alan Stewart, an engineer employed by Omega, was in charge of supervising

Accu-Fab's work on Omega's premises. When Omega abruptly instructed Accu-Fab to work on Tank #10 on July 28, 2014, Joey Norman of Accu-Fab asked Alan Stewart to "clear" Tank #10 for hot work. On information and belief, Stewart, acting on behalf of Omega, refused to use a combustible gas detector to test Tank #10 for flammable gases and failed to otherwise eliminate the flammable gases inside of Tank #10. Instead, Stewart represented to Norman that Tank #10 was safe and ready for hot work, telling Norman that Tank #10 contained stickwater which was neither hazardous nor flammable. In addition, Stewart added that it would cost Omega several thousand dollars to drain the stickwater out of Tank #10. In reliance on the representations of Stewart, acting on behalf of Omega, Accu-Fab instructed its workers to proceed with hot work on Tank #10.

### E. The Wrongful Death of Jerry Lee Taylor II

21. Jerry Lee Taylor II ("Jerry Lee"), hired by Global for work with Accu-Fab, reported to work at Accu-Fab's business premises in Moss Point, Mississippi on the morning of July 28, 2014. Shortly thereafter, Jerry Lee and Walls were sent to Omega, and upon arrival, the Accu-Fab foreman, Rusty Gables, directed Jerry Lee and Walls to cut the piping off of the top of Tank #10. Gables told Jerry Lee and Walls that Tank #10 was "good to go", which in welder parlance meant that Tank #10 was cleared for hot work.

22. As Jerry Lee and Walls climbed the stairs to the top of Tank #10, they noticed two other Accu-Fab workers at ground level who were performing hot work at the base of Tank #10. The fact that hot work was already underway further confirmed to Jerry Lee and Walls that Tank #10 had been cleared for hot work.

23. While Jerry Lee and Walls were positioned on top of Tank #10, the hot work at its

base, which was heating Tank #10 and its contents, ignited the hydrogen sulfide, methane and/or methanethiol gases contained inside Tank #10, resulting in an explosion of such magnitude that it blew the almost 20,000 lb. top off of Tank #10. Because the force of the explosion traveled from the bottom of Tank #10's interior toward its top – as evidenced by the upward force which blew off its top – ignition of the gases contained inside the bottom interior of Tank #10 most likely initiated the explosion. In the alternative, and even though unlikely, the explosion was initiated by the hot work being performed at the top of Tank #10. In either event, the explosion would not have occurred, and no harm would have been sustained, but for Omega's negligence.

24. The force of the explosion shot Wall's body some 100 feet to the southwest of Tank #10, where he landed and tore through the thin, pliable roofing of an adjacent building. Walls miraculously survived the explosion, albeit with severe personal injuries.

25. The explosion catapulted Jerry Lee's body 100 feet to the southeast, where he died after landing on the unforgiving metal top of another tank in the tank farm. Jerry Lee's Death Certificate reflects that he died from "massive injuries to head, neck, trunk and extremities" due to "blunt force impact". Jerry Lee, twenty-five (25) years old, survived by a small son and pregnant wife, was pronounced dead at 10:39 a.m. on July 28, 2014.

### F. The Post-Explosion Investigation

26. Tank #10 was drained on July 30, 2014, and 8 inches of stickwater was recovered therefrom. Samples of the remaining stickwater were collected for testing, and under the auspices of the United States Chemical Safety Board, were provided to Dr. Clifford Lange at Auburn University for independent testing. Dr. Lange's analysis of the stickwater proves to a certainty that decomposition of the organic matter in the stickwater produced significant volumes

of hydrogen sulfide, methane and methanethiol inside of Tank #10.

27. Additional post-explosion tests were conducted of the stickwater and gases found in the downstream piping running from Tank #10. This analysis, conducted by experts retained by Omega, also demonstrated the presence of significant volumes of hydrogen sulfide, methane and methanethiol.

## Duties and Breaches

28. At all times pertinent hereto, Omega acted by and through its employees whose negligent acts and omissions are imputed to Omega under the doctrine of *respondeat superior*.

## I

## Failure to Investigate and/or Warn of the Dangers and Hazards of Stickwater

29. At all times pertinent hereto, Omega was charged with such knowledge as the exercise of reasonable care would have disclosed, including the characteristics of the substances produced by its business operations and the dangers and hazards incident thereto. Omega either knew of the dangers and hazards pertinent to stickwater, or was negligent in not discovering such dangers and hazards.

30. As the owner and operator of a fish processing plant which generated stickwater as a manufacturing byproduct, Omega had a duty to reasonably investigate the dangers and hazards of stickwater and the contents of Tank #10, *via* scientific inquiry, testing or otherwise, and to give adequate warning of such dangers and hazards to its employees and others, such as Jerry Lee Taylor II, who would foreseeably come into contact with Tank #10.

31. Omega breached such duties owed to Jerry Lee Taylor II and others, in that:

  a. Omega failed to conduct a reasonable investigation of the dangerous and hazardous propensities of stickwater, including but not limited to, the flammable gases contained in Tank #10;

  b. Omega failed to adequately inspect its premises to ensure that it was surrendering a reasonably safe work environment to Jerry Lee Taylor II and others;

  c. Omega failed to conduct combustible gas testing for the presence of flammable gases inside Tank #10;

  d. Omega failed to remove flammable gases from Tank #10 by the use of intert gas, by filling Tank #10 with water so as to purge all flammable gases therefrom, by draining all stickwater from Tank #10, and/or by adequately ventilating Tank #10, prior to authorizing hot work thereon;

  e. Omega failed to promulgate safety rules and procedures regarding stickwater, flammable gases, and/or hot work, and/or failed to ensure that such rules and procedures were enforced and followed;

  f. Omega failed to conduct a safety orientation or otherwise instruct, train and warn its employees and others, including Jerry Lee Taylor II, of the dangers and hazards of stickwater;

  g. Omega failed to appropriately label Tank #10 so as to adequately warn Jerry Lee Taylor II and others coming in contact therewith of the risks, dangers and hazardous propensities of its contents;

  h. Omega authorized and allowed hot work to be performed on a tank which contained an explosive atmosphere due to the presence of flammable gases generated by stickwater therein; and

i.      In other ways to be proved at trial, Omega unreasonably exposed Jerry Lee Taylor II to an unreasonable risk of harm by failing to take reasonable measures to guard against foreseeable hazards about which Omega knew, or should have known, in the exercise of reasonable care.

## II

## Premises Liability

32.     Jerry Lee Taylor II entered Omega's premises at its express or implied invitation for the mutual advantage of himself and Omega, and at all times pertinent hereto, was an invitee on the premises of Omega.

33.     Omega owed Jerry Lee Taylor II the duty to keep its premises reasonably safe, including the duty to surrender to him a reasonably safe work environment, and when not reasonably safe, the duty to warn Jerry Lee Taylor II of all hidden dangers and perils about which Omega knew, or should have known in the exercise of reasonable care.

34.     Omega breached such duties owed to Jerry Lee Taylor II, in that:

a.      By production of stickwater as a part of its manufacturing process, and the flammable gases it generated, Omega caused and created a hazardous condition to which it exposed Jerry Lee Taylor II by ordering Accu-Fab to perform hot work on Tank #10; and

b.      Omega failed to adequately warn Jerry Lee Taylor II of a dangerous condition about which it knew, or should have known in the exercise of reasonable diligence.

## III

## Negligent Misrepresentation

35.     By representing to Accu-Fab, and hence Jerry Lee Taylor II, that it was safe to

perform hot work on Tank #10, Omega was obligated to exercise reasonable care in making such representation.

36. Omega, acting by and through its employees, negligently misrepresented to Accu-Fab, acting on behalf of Jerry Lee Taylor II, the dangers and hazards pertinent to Tank #10, and the stickwater therein, in that:

 a. Omega's representation that Tank #10, and its contents, were safe for hot work, was a misrepresentation and/or omission of fact which was both material and significant;

 b. In making such misrepresentation, Omega failed to exercise that degree of diligence and expertise which members of the public, including Jerry Lee Taylor II, are entitled to expect of Omega;

 c. Accu-Fab, acting on behalf of Jerry Lee Taylor II, and Jerry Lee Taylor II reasonably relied upon Omega's representations concerning Tank #10 and the stickwater therein; and

 d. Jerry Lee Taylor II suffered fatal injuries and died as a direct and proximate result of the reliance of Accu-Fab, acting on his behalf, on Omega's representations.

## Damages

### I

### Damages which the Decedent could have Recovered

37. Plaintiff, on behalf of Jerry Lee Taylor II and/or his Estate, seeks recovery of the following damages, all of which Jerry Lee Taylor II could have recovered if he had survived the explosion caused by Omega's negligence:

 a. Damages for the value of the impairment and/or destruction of the quality

of his life;

    b.    Damages for all pain and suffering and mental anguish which he experienced from the moment of the explosion up to the time of his ultimate demise;

    c.    All burial and interment costs;

    d.    Any necessary and reasonable expenses of emergency responders or medical personnel which were incurred as a direct and proximate result of the negligent acts and omissions of Omega; and

    e.    Damages for the present value of the impairment of his future earning capacity in the amount of $1,414,770.00.

## II

### Damages Sustained by the Survivors of Decedent

38.    Plaintiff, individually and on behalf of all wrongful death beneficiaries who survived Jerry Lee Taylor II, seeks recovery of the following damages due to the negligent acts and omissions of Omega which proximately resulted in his death:

    a.    As to Katlyn Taylor, the widow of Jerry Lee Taylor II, all damages recoverable under Mississippi law due to his death, including damages for her losses of love, consortium, society, companionship, services, contributions, support, and care for the balance of Jerry Lee Taylor II's natural life expectancy; and

    b.    As to Weston Pierce Taylor and Jackson Lee Taylor, the natural children of Jerry Lee Taylor II, all damages recoverable under Mississippi law due to his death, including damages for their losses of love, society, companionship, services, contributions, support, care and moral training for the balance of Jerry Lee Taylor II's

natural life expectancy.

### III

### Punitive Damages and Attorneys Fees

39.     In the event of proof of grossly negligent or reckless conduct on the part of or attributable to Omega, Plaintiff is entitled to an award of punitive damages against Omega to punish it for such conduct and to deter Omega and others similarly situated from like conduct in the future.

40.     In the event of an award of punitive damages in this action, Plaintiff is entitled to an award of her reasonable attorneys fees incurred in the prosecution of this action.

### Ad Damnum

WHEREFORE PREMISES CONSIDERED, Plaintiff Katlyn Taylor, individually and on behalf of all wrongful death beneficiaries of Jerry Lee Taylor II, and in her capacities as Administratrix of the Estate of Jerry Lee Taylor II and Guardian of Weston Pierce Taylor and Jackson Lee Taylor, Minors, now brings this action against the Defendant, Omega Protein, Inc., and demands judgment of and from Omega Protein, Inc. for all compensatory damages, punitive damages and attorneys fees alleged hereinabove, in an amount in excess of Seventy-Five Thousand Dollars ($75,000) exclusive of interest and costs, and for all costs of this action to be assessed.

### Jury Trial Demand

Plaintiff hereby demands trial by jury on all issues of fact presented in this action.

_____
William Liston III (MSB # 8482)
LISTON/LANCASTER, PLLC
P.O. Box 14127
Jackson, Mississippi 39236
Tel. (601) 982-1636
Email: wlist3@aol.com

ATTORNEY FOR PLAINTIFF,
KATLYN TAYLOR